FREDERICK O. KIMBALL *et al.*

*v.*

M. McKENDREE TOOKE.

1.  SPECIFIC PERFORMANCE.  A party can not call upon a court of equity for a specific performance of a contract, unless he has made a con-scientious effort on his own part to comply honestly with the contract.

2.  Specific performance will not be enforced if there is anything that makes it unconscionable, from change of circumstances, lapse of time, or otherwise, to enforce it.

3.  A court of equity is not bound to compel the performance of every contract.  Although there may not be sufficient grounds for annulling it, under some circumstances, the court might be unwilling to decree either party affirmative relief.

4.  TIME—*when it is of the essence of the contract.*  A provision in a con-tract for the sale of land, that, if the vendee failed to make either of the payments therein provided for, the vendor, at his option, might declare a forfeiture, in effect, makes time of the essence of the contract, and imposes upon the vendee the necessity of offering to perform on his part at the time named in the contract.

5.  OFFER TO PERFORM—*when and by whom it should be made.*  The ven-dor sold land to the vendee, to be paid for in several installments, the first of which became due on the 15th day of the next month.  The contract provided that, in case of the failure of the vendee to make either of the payments, the vendor might, at his option, declare a forfeiture.  It was *held,* that the vendee was bound to tender payment of the first installment when it became due, to avoid a rescission of the contract.

6.  In such a case, the fact that there was an incumbrance or cloud upon the title, would not relieve the vendee from the obligation to make an offer of performance on his part, and the mere omission to make such offer would warrant a rescission of the contract by the vendor.

7. TENDER—*to whom it should be made.* A purchaser of land should tender the purchase money to the vendor—the owner of the fee—if he desires to show a proper effort on his part to execute the terms of the contract. A tender to one who holds only a dower interest will not avail.

8. FORFEITURE—*what amounts to an acquiescence in.* Where it was claimed by a vendor that he had declared a forfeiture of the contract for a failure by the vendee to make the first payment, and the vendee, at a subsequent time, tendered the amount of such first payment to the vendor, and the vendor refused to receive the same, and stated to the vendee that the contract was at an end—that no contract existed—it was still obligatory upon the vendee to make a tender of the other installments as they became due, and a failure to do so will be an acquiescence in the declaration of forfeiture, whether it was rightfully made or not, in the first instance.

APPEAL from the Circuit Court of Cook county; the Hon. W. W. FARWELL, Judge, presiding.

Mr. MILTON T. PETERS, Mr. E. A. SMALL, and Mr. JOHN N. JEWETT, for the appellants.

Messrs. HARDING, McCOY & PRATT, and Mr. E. W. EVANS, for the appellee.

Mr. JUSTICE SCOTT delivered the opinion of the Court:

The contract between the parties which appellee seeks to have specifically executed, bears date the 27th day of February, 1869. On that day, appellants sold to appellee the tract of land described in the bill, for the sum of $30,000, payable as follows: $100 cash in hand; $5000, including the $100 paid down, on or before the 15th day of March, 1869; $5000 on the 1st day of September, 1869, and the remainder in two equal annual installments of $10,000—the payments to be secured by mortgage, with power of sale, and to bear interest at the rate of eight per cent per annum. The contract contained a clause in which it was expressly provided, in case of the failure of the vendee to make either of the payments, or perform any of the covenants on his part, the vendors, at their option, might declare a forfeiture, and retain all payments previously made as liquidated damages.

The bill was not filed until the 12th day of September, 1872. All the installments had matured long prior to that date. The only payment that was ever made on the purchase was the sum of $100, at the date of the execution of the agreement.

The right to relief is predicated on the ground that, at the maturity of the installment due March 15, 1869, there appearing to be an incumbrance upon the land, created by two old unsatisfied mortgages, and a cloud upon the title, caused by a conveyance by and back to Hart L. Stewart of a portion of the land, appellant Frederick O. Kimball, who is the real owner of the land, the other appellant having only a dower interest, voluntarily waived payment on that day, with a view to get time to remove the incumbrances from the land, and the cloud from the title. The extension mutually agreed upon, it is alleged, was from the 15th to the 16th of March, and from the latter date to the next Saturday or Monday.

On the contrary, appellants insist they were ready on the 15th of March, with a deed properly executed, to perform the agreement; that there was no extension of the time of performance agreed upon or consented to by them beyond the 16th of March, at 2 o'clock in the afternoon of that day, and the installment due on the day previous not having been paid, a formal declaration of forfeiture was made, with a view to put an end to the contract.

There are but few facts material to the consideration of the case, and scarcely any contradiction in the testimony relative to them, except as to what occurred between the parties at the several interviews on the 15th and 16th of March, 1869. All the witnesses who testify on either side, from their own knowledge as to what transpired at those interviews, were at the time interested in the property. The interests of Pitner and White have since been extinguished.

Passing over, for the present, what occurred between the parties on the 15th and 16th of March, a brief statement of the other facts and events as they transpired, so far as they

are necessary to illustrate the case, may be made. Whatever may have been the understanding, it is certain Kimball did not call on him after the interviews on the 15th and 16th of March, but Tooke wrote him two letters in relation to the completion of the unsettled business between them. The first letter is without date, but, from the testimony, it was written about the 25th of March, in which it is said it is understood Hart L. Stewart is willing to give a quit-claim deed, to correct the records of the title to Kimball's land, and that they are ready to close the matter on call. This letter is signed by Pitner and Tooke. No allusion is made in it to any incumbrance upon the property. The next letter is dated April 19, 1869, in which he says he has been waiting for several days for Kimball to call with the deed to the premises, with the title perfected, and that the money is in the bank. Both letters were received, but no replies sent.

On the 1st day of May, Tooke called on Kimball, at his residence, in regard to the matter, but Kimball would entertain no negotiations about the property, and most unequivocally assured him there was no contract existing between them; that it had been forfeited for non-payment of the installment due on the 15th of March. On his return, Tooke immediately caused a mortgage, with power of sale, to be prepared, to secure the deferred payments, and, on the 5th of May, White, acting as the agent of Tooke, called at the residence of appellants on the premises, and tendered to Mrs. Kimball the mortgage, together with the $5000, less $100 previously paid, with interest from the 15th day of March, and demanded a deed, which was refused, for the reason assigned, that the contract had then been declared forfeited. At the same time, White left a written notice for Frederick Kimball, that the mortgage, notes and money would be deposited in his safe, subject to his order. There is no pretense there has been any offer by Tooke, or any one for him, to pay either of the subsequent installments as they severally became due, and no offer whatever, other than that contained in the bill, to pay what-

ever amount should be found due, if the court should decree a specific performance of the agreement.

The reason assigned for the long delay in bringing this bill is, that, on the 2d day of December, 1869, appellants filed their bill in the Superior Court of Chicago, to cancel the contract, which had previously been placed on record in the proper office, on the ground it was a cloud upon the title of the property, the same having been declared forfeited for the non-payment of the installment due March 15, 1869. That bill had been dismissed by the Superior Court for want of equity, and the cause was still pending in the Supreme Court. The appellee alleges he was advised by counsel that the decision in the Supreme Court would definitely settle the rights of the parties, and hence no steps were taken by cross-bill in that case, or by original bill, to compel a specific performance of the contract.

It is contended, the former decision is conclusive of one controverted fact in this case, viz: that there was no formal declaration of forfeiture of the contract by the vendors on the 16th day of March, 1869. However that may be, we do not think that decision affects the merits of this controversy. The decree of the Superior Court was modified in this court so as to stand as a decree without prejudice to the rights of the parties, in case a bill should be brought by the vendee for a specific performance of the contract. Concerning the position of the parties in reference to such possible litigation, the court expressed no opinion.

The former bill was filed by appellants to have the contract rescinded on the ground that the payment to be made on the 15th of March was not made or tendered, and that the vendors then gave notice of their election to declare a forfeiture. This was the sole ground upon which relief was sought. Counsel for the vendee then insisted the court should confine its decision to the case made by the bill, and, in view of that fact, it was said, "whether, as urged by appellants, it was the duty of Tooke to tender payment of the first install-

ment before the 5th of May, even accepting his own evidence as to what occurred on the 15th and 16th of March, or whether it was also his duty to tender the September installment, are questions to be solved when Tooke shall file a bill for specific performance, if he ever takes that course. They are certainly not questions presented by the pleadings in the case." *Kimball* v. *Tooke,* 64 Ill. 380.

These are the controlling questions in the present case. They lie at the foundation of the right to the relief sought. By the former decision, we are left perfectly free to determine them as upon first impression.

We have carefully considered the case in all its phases, and we are unable to perceive anything in the record that would relieve appellee from the duty to tender the first installment on maturity, or certainly on the 16th of March. It was the agreement the vendors, in case of a failure to make "either payment" at the appointed time, might, at their option, declare a forfeiture. That provision, in effect, made time of the essence of the contract.

There was no express agreement, nor indeed anything from which consent could be inferred, to extend the time of payment of the first installment beyond the 16th day of March; and, in the absence of such an agreement, or proof of circumstances that would throw him off his guard, the law made it the duty of the vendee to tender compliance with his contract. A failure in this respect gave the vendors the option to rescind the agreement.

On the question of the extension of the time of payment of the first installment, the testimony can hardly be said to be contradictory. Kimball is positive in the assertion there was no extension beyond two o'clock of the afternoon of 16th of March, and Tooke's declaration is, "he said nothing to the contrary, and we took it for granted that it was the intention to perfect the title before requiring the payment," and that he "seemed willing to make the necessary effort to get it (the cloud upon the title) removed." Clearly, there was

neither an express nor an implied agreement to waive prompt payment of the first installment.

Neither the incumbrance upon the property nor the cloud upon the title insisted upon constituted any valid excuse for the failure of the vendee to offer to perform his agreement. The vendors could remain passive until there was offer of performance on the part of the vendee, and a mere omission would warrant a rescission of the contract; but they did not choose to remain passive. There is evidence that proves conclusively the vendors were ready, with a deed to the property, to proceed with the execution of the agreement. What excuse has the vendee shown for not accepting the deed tendered, and paying the installment then due under the contract? The law has cast the burden upon him to show, by satisfactory proof, a reasonable excuse for non-performance. This he has not done. There is absolutely nothing in the facts proven that would justify the vendee to hesitate to perform his contract. The objections taken to the title were frivolous, and it seems hardly possible any person anxious and ready to perform his agreement, would insist upon them. He knew, according to his own testimony, before the meeting on the 16th of March, that Hart L. Stewart claimed no interest whatever in the premises, and had expressed a willingness to release any apparent interest. It was known to him that the vendors had been in possession of the premises for more than twenty years, and that it was by a mere clerical error that Stewart included a portion of the property in a deed made by him. His grantee had reconveyed to him, and he had assured the parties of his readiness at any time to execute a quit-claim. This fact could not render the title suspicious in the mind of any reasonable man.

The incumbrance claimed to be upon the property, was insignificant in amount, and, withal, it was a stale claim. It appears there were two unsatisfied mortgages on the property, both given by Osgood Kimball, in his lifetime, to Henry G. Hubbard, one dated in 1846, and the other in 1851. The

latter appears to have been given in renewal of the former, but whether it was or not, the indebtedness secured by the first was barred by the Statute of Limitations. The last one was to secure four notes, each for $88.56, payable in one, two, three and four years. Hubbard died in 1852, and Osgood Kimball in 1853. Mrs. Kimball was the administratrix of her husband's estate, and was appointed in 1853. She states, no claim was ever presented against the estate on account of the notes secured by the mortgage, and that Mrs. Hubbard, who was the administratrix of her husband's estate, had told her, in 1853, that all had been paid on the mortgages that should be, and, so far as she was concerned, she was ready to give them up. The abstracts of title, which showed the existence of the mortgages, contained, also, a memorandum that a bill to foreclose the latter mortgage had been dismissed for want of prosecution, in 1868. This, if it was not a bar, would seem at least to be an abandonment of the claim. These facts were known to Tooke. It was unreasonable to insist that Kimball should first pay this old, stale claim, that the parties in interest did not themselves insist should be paid. It was a mere pretext for delay, and constituted no valid reason for not tendering performance of the contract. Before he could refuse to perform the contract, it must be shown the facts were sufficient to cast a cloud upon the title, and render it suspicious in the minds of reasonable men, so as to affect seriously its market value. *Snyder* v. *Spaulding,* 57 Ill. 480.

The facts in this case were not of this character. So far as the apparent interest in Stewart was concerned, the vendee was advised by Stewart himself he claimed no interest in the property, and, as to the incumbrance alleged, certainly no reasonable man, with the facts before him, that the claim was stale, trifling in amount, and the bill to enforce it had been dismissed for want of prosecution, could, with any show of sincerity, insist it constituted any valid objection, and especially where $25,000 of the purchase money remained to be paid. The objection seems so absurd that it is difficult to

appreciate it was put forth in good faith. Some other reason must have existed why the vendee and the other parties interested with him were not anxious and earnest to complete the contract on the 15th or 16th of March. It may be the attendant circumstances afford an explanation to their conduct.

It is shown the property had been bought at rather a high price. Two enterprizes of very considerable importance were then in contemplation, viz: the construction of the South Park and the establishing of the Cook County Normal School, and if they should not be located in the vicinity, there would be but little speculation in the purchase. Neither had then been definitely determined upon. Their location in the vicinity would materially affect the price of the land. This was the belief of all parties. It was known to them these questions would be settled in a few days. The vote fixing the South Park near this land was taken on the 23d of March, and the decisive vote of the board of supervisors accepting the donation of land in the immediate neighborhood, on which to locate the Normal school, seems to have been taken on the 19th day of March.

It is difficult to avoid the impression these facts make, that the objections taken to the title, so unsubstantial in their character, were a mere invention to postpone the consummation of the contract until after these questions had been settled; if favorable to the investment, to insist upon a fulfillment, and if unfavorable, to make the objections the basis of a rescission of the contract. It seems singular, as insisted upon by Tooke, that Kimball would employ White, himself deeply interested in the transaction, as his own agent to procure the release of the old mortgages, when no one was, or had been for many years, insisting upon payment of the indebtedness thereby secured, and against which the Statute of Limitations would soon run, perhaps before the last payment under the contract would become due. These acts do not have the appearance of good faith. The law will not permit a party to adopt plans to secure delay which would afford

36—70TH ILL.

him an opportunity to speculate on the advantages of his bargain. *Doyle* v. *Teas,* 4 Scam. 202.

In the case at bar, time, by the agreement of the parties, was of the essence of the contract. It was, therefore, incumbent on the vendee to tender the amount of the first installment on maturity, and if the title the vendors had to offer was not such as he had contracted for, he was not bound to part with his money; but the vendors, however, were ready with a good title, at least no valid objection, under the circumstances, could have been urged against it, and it was obligatory upon him to receive it. Whether the title of the vendors was entirely free from fault or not, the vendee ought to have placed them in default by tendering performance.

Had the park and the Normal school been previously located in the vicinity, the evidence leaves no room to doubt the tender would have been made and a deed accepted, notwithstanding the objections urged. They were too trifling to stand in the way of any reasonable man who was anxious and willing to comply with his contract. Equity will not assist a party who has himself been guilty of prevarication. He can not call upon a court of equity for a specific performance, unless he has made a conscientious effort on his own part to comply honestly with the contract, or, in the language of the books, "unless he has shown himself ready, desirous, prompt and eager."

No tender of the first installment was ever made to Frederick O. Kimball, who was the real owner of the land. The tender that was made on the 5th of May was made to Mrs. Kimball. Her's was only a dower interest. She had no title, and could make no conveyance. She could only release her dower to the owner of the fee. This fact was known to the parties when they made the tender. It should have been made to the party owning the fee.

Nor was the tender, such as it was, kept alive. The money used belonged to White, and could only constructively be said to belong to Tooke, because, by the terms of their agree-

ment, it was to go to him for an interest in the property; but White parted with that interest, whatever it was, in 1870, and there is no evidence that, after that date, any money was kept under the control of the vendee with which to pay the installment alleged to have been tendered. All the authorities hold the tender must be kept good, so that if the party entitled to receive it shall conclude to take it, the money will be ready for him. The theory of the law is, it is the money of the party to whom it has been tendered, and must be kept in readiness for him while there exists the *locus penitentiæ.*

But an insuperable objection to a specific performance of the contract is to be found in the fact that neither of the subsequent installments was made as they severally became due. Whether Kimball made any declaration of forfeiture on the 16th day of March, he did on the occasion of the visit of Tooke to his house a few days before the alleged tender on the 5th of May. He was then distinctly informed the contract was at an end—that no contract existed.

Having failed to make any tender of the subsequent installments, we think the law is settled it was an acquiescence in the declaration of forfeiture, whether rightfully made or not. This is the doctrine declared in *Iglehart* v. *Gibson,* 56 Ill. 81. There, the declaration of forfeiture by the vendor was conceded to be wrongful; but it was ruled, if the vendee intended to hold the contract as subsisting, and claim a specific performance, he should have paid or tendered the subsequent payments as they fell due, and, without showing it was the result of fraud, accident or mistake, he will be presumed to have acquiesced in the repudiation of the contract by the vendor.

It is contended, the failure to make the subsequent payments can be justified, because it is insisted it was obligatory upon the vendors to make the vendee a deed on payment of the first installment, which, it is alleged, was tendered, and, on the principle the contract should in equity be regarded as executed after the tender, there could be no forfeiture for

defaults in future payments. The agreement, in this respect, is of doubtful meaning, and whether it is the true construction as contended, that appellants were to make a deed to the premises, to be delivered to appellee on payment of the first installment, it will not be necessary to determine. It is sufficient it was the contract between the parties, that, in case of a failure to make "either of the payments," the vendors, at their option, might declare a forfeiture. The contract remained executory, and it was as much the privilege of the vendors to rescind it for non-payment of the future installments as the first one. It is not claimed the installment due on the 1st of September, 1869, was either paid or tendered; and if there was no other declaration of forfeiture, the filing of the bill by appellants, on the 2d of December following, to cancel the agreement, was an emphatic repudiation of the contract. No effort was made to pay or tender the two remaining installments. The last one matured in 1871, nearly eighteen months before this bill was filed.

No reason other than the technical one suggested has been assigned for the omission to make or tender these several payments of the purchase money, according to the terms of the contract. On the doctrine of *Iglehart* v. *Gibson, supra,* the *laches* of the vendee, in this regard, would constitute an effectual bar to a specific performance of the contract, if no other reason existed.

But a court of equity is not bound to execute every contract, although there may not be sufficient grounds for annulling it. When this cause was before this court at a former term, on the bill of appellants, no sufficient reason was perceived for cancelling the agreement; but it by no means follows the vendee, for that reason, would be entitled to a specific performance of it. The court might be unwilling, under the circumstances, to decree either party affirmative relief.

No doctrine is better settled than that this matter of cancelling or enforcing contracts is within the sound, legal dis-

cretion of the court. Equity will withhold its aid, if there is anything that makes it unconscionable, from change of circumstances, lapse of time, or otherwise, that the party should have execution of his agreement. *Taylor* v. *Merrill,* 55 Ill. 52, and cases cited.

This principle is conclusive of the case we are considering. Since the making of the contract, the circumstances surrounding the parties have changed. Enterprizes, then only in contemplation, have been matured, that materially affect the value of the property. It has since tripled in value. Only the trifling sum of $100 was ever paid on the purchase, and that was in 1869. Since then, installments, amounting in the aggregate to near $30,000, have matured, and yet it is not claimed that any of them have been either paid or tendered, except the first one of $5000. The delay in making or tendering payment of the first installment, or indeed of any of them, has not, and can not, be explained consistently with good faith or a willingness on the part of the vendee to perform his agreement.

Counsel cite, with great confidence, the case of *Wallace* v. *McLaughlin,* 57 Ill. 53. The facts of that case are distinguishable from the one at bar. There, the vendees were in possession by permission of the vendor, and had made lasting and valuable improvements on the premises before they discovered the title was in any manner incumbered. The delay in making the payments seems to have been by the consent of the vendor. He repeatedly said to the vendees he would not crowd them, and, at one time, that he never would if they would pay the interest. There were two subsisting mortgages which constituted substantial incumbrances upon the land, large in proportion to the entire purchase money, and, in addition, there was a contingent right of dower that might become absolute. These facts created strong equities in favor of the vendees, and it was thought the claim of the vendor, on declaring a forfeiture, that he should have back the land, with all the improvements that had been put upon

it, and keep all the payments that had been made, was unconscionable. The relief was decreed on the distinct ground that the vendor's conduct had created such equities, in respect to the land, that it properly required the aid of a court of equity to adjust them, and it was his duty to apply to such a court for that purpose, rather than to a court of law, to enforce his own unconscientious claim in the matter. The objections taken to the incumbrances on the land were in good faith, and such as any reasonable man might insist upon, especially when called upon to make the last payment.

But the facts are very different in the case before us. There is nothing in the conduct of the vendors that has created any equities, in respect to the land, in favor of the vendee, that makes a resort to a court of equity necessary to adjust them. Under the circumstances, it would not be unconscientious to permit the vendors to declare and insist upon a rescission of the contract.

The vendee was not, as in *Wallace* v. *McLaughlin,* called upon to make the last payment when he interposed obstacles to the further execution of the contract; nor does it appear to us the objections could have been urged in good faith. The incumbrance alleged to be upon the land was inconsiderable in amount, in comparison with the unpaid balance of the purchase price. What was claimed to be a cloud upon the title, created by the deeds from and back to Stewart, was purely a captious objection, and it is inconceivable that any one eager to perform his contract would insist upon it with sincerity. It looks as though it must have been done, as was before suggested, with a view to afford the vendee and those operating with him an opportunity to speculate on the advantages of the bargain. We think the evidence tends to establish this view of the case; for, as soon as the park and the Normal school were located, appellee showed a degree of anxiety to perform the agreement, that he had not before exhibited. In no view that we have been able to take of the case, is he

entitled to have the contract specifically executed in his favor. It would be most inequitable to do so.

As the decree upon the original bill will be decisive of the rights of the parties, we have not deemed it necessary to review the case made by appellants on the cross-bill. The court, in its decree, does not seem to have made any disposition of it. It should have been dismissed, which will now be done.

The decree of the circuit court will be reversed, and the original bill dismissed in this court, at the costs of appellee.

*Decree reversed.*

Mr. JUSTICE SHELDON dissents.