(No. 19826.—

CHARLES V. GREENGARD, Appellee, *vs.* ABNER J. BERNSTEIN *et al.* Appellants.

*Opinion filed February 18, 1931—Rehearing denied April 8, 1931.*

LATKIN & COHN, HENRY ANTES, and CLARK & CLARK, for appellants.

IRVING G. ZAZOVE, (MORRIS K. LEVINSON, of counsel,) for appellee.

Mr. COMMISSIONER PARTLOW reported this opinion:

Appellee, Charles V. Greengard, filed his bill in the superior court of Cook county against appellants, Abner J. Bernstein, Bessie Bernstein, his wife, and Sol Rubin, for the specific performance of a contract for the sale of real estate and to set aside the lien of a certain judgment as to the real estate in question. Upon issue being joined there was a hearing before the chancellor, a decree was entered as prayed, and an appeal has been prosecuted to this court by the Bernsteins and Rubin.

Appellants insist that the decree is contrary to the law and the evidence; that the allegations of the bill with reference to the readiness of appellee to perform are not supported by the evidence; that the evidence does not show that appellee was ready, able and willing to perform; that he made no tender, and that the defects in title specified by appellee were not cured or waived.

The evidence shows that Bernstein and wife were the owners of a building at 3435 South Halsted street, in Chicago, containing a store room and two apartments. September 5, 1928, he and his wife entered into a written contract to convey the premises to appellee. Five hundred dollars was paid as earnest money, $15,500 was to be paid five days after the title had been accepted by appellee, and an indebtedness of $4000 was to be assumed. The contract called for a merchantable abstract of title and provided as follows: "In case material defects being found in said title, and so

reported, then, if such defects be not cured within sixty days after such notice thereof, this contract shall, at the purchaser's option, become absolutely null and void and said earnest money shall be returned; notice of such election to be given to the vendor, but the purchaser may nevertheless elect to take such title as it then is, and in such case the vendor shall convey as above agreed; provided, however, that such purchaser shall have first given a written notice of such election within ten days after the expiration of said sixty days and tendered performance thereof on his part. In default of such notice of such election to perform and accompanying tender within the time so limited, the purchaser shall, without further action by either party, be deemed to have abandoned his claim upon said premises, and thereupon this contract shall cease to have any force or effect as against said premises or title thereto or any right or interest therein, but not otherwise."

After the contract was signed the negotiations for closing the deal were conducted by the attorneys for the respective parties. The attorney for appellee testified that he was not able to secure the abstract of title from Bernstein after repeated requests therefor; that finally he secured the abstract from the Chicago Title and Trust Company on September 24; that he examined it and on September 28 prepared a letter stating his objections, a copy of which was delivered, with the abstract, to the attorney for Bernstein; that he tried to hurry the closing of the deal but received no co-operation from Bernstein or his attorney; that he and the attorney for Bernstein were agreeing on the defects in title, and that about two weeks after the delivery of his opinion on the title he was informed that a judgment for over $20,000 had been entered against Bernstein and the sheriff had been instructed to levy upon the premises in question. The record shows that the judgment was entered on September 29, 1928, for $24,841.86, based upon an alleged promissory note dated September 21,

1926, for $22,000, payable two years after date to the order of Rubin and signed by Bernstein. Appellee testified that on September 28, 1928, he was ready, able and willing to pay for the property as provided in the contract and that he is still able and willing to do so. He contends that after the contract was executed Bernstein learned that there was a prospect of a chain store wanting the building; that Bernstein wanted to back out of the trade, and as a means of so doing procured the judgment to be taken as a bar to closing the deal.

Specific performance is not a matter of absolute right but rests in the sound discretion of the court in view of all the circumstances. (*Farson* v. *Fogg,* 205 Ill. 326; *Gray* v. *Chicago, Milwaukee and St. Paul Railway Co.* 189 id. 400.) But the chancellor has no arbitrary discretion to deny relief. (*Miller* v. *Shea,* 300 Ill. 180.) Specific performance will not be denied where there is a fair and valid contract and the party seeking performance has performed or offered to perform all of the terms and conditions required of him. (*Fagan* v. *Rootberg,* 320 Ill. 586; *Baltimore and Ohio Southwestern Railroad Co.* v. *Brubaker,* 217 id. 462; *Ullsperger* v. *Meyer,* 217 id. 262.) Where the contract requires money to be paid by the vendee and a deed delivered by the vendor at a certain time, those covenants are mutual and dependent and neither party can compel the other to perform without first making a tender of the money or of the deed. (*Kimball* v. *Tooke,* 70 Ill. 553; *Murphy* v. *Lockwood,* 21 id. 611.) But a tender by the buyer is unnecessary when the acts of the seller have been such as to render such act a useless thing. (*Neidhardt* v. *Frank,* 325 Ill. 596; *Mishelsky* v. *Carman,* 320 id. 123; *Fleming* v. *O'Donohue,* 306 id. 595; *Cohen* v. *Segal,* 253 id. 34; *Cumberledge* v. *Brooks,* 235 id. 249.) Here the contract was fully and fairly executed. No complaint is made as to any of its terms. After it was executed appellee took immediate and decisive steps to complete the trans-

action. The evidence in this respect is not controverted. It is apparent that shortly after the contract was executed appellants changed their minds about this transfer of the property, and they rendered very little, if any, assistance about closing the deal. Their change of mind is apparent from the rendition of the judgment, which will be later considered. After the judgment was entered appellee was under no obligation to make a tender or to conduct further negotiations. The acts of appellants were such as to render further actions unnecessary and useless. The evidence shows that appellee was able, ready and willing to complete the contract and the decree properly so found.

The next question is whether the judgment was *bona fide* or whether it was a mere pretext to prevent the consummation of the trade. Bernstein testified that in June, 1926, he and Rubin made a deal to buy the property at Bennett and Seventy-third streets and the property at Broadway and Admore street, in Chicago. He told Rubin he did not have any money, and Rubin said that he (Rubin) would do the work provided Bernstein would furnish the money or give a note for the expense of getting the title. The note in question was given on September 1, 1926, in the office of Rubin, and $22,000 was agreed upon as the amount necessary to clear the title. Bernstein testified that his name did not appear in the chain of title to either of these properties and he was satisfied to have this condition exist; that Rubin asked him for money from time to time but he had no money, and that Rubin was not to render a statement of the account until the deal was closed. He testified that he owned five pieces of property at the time Rubin confessed the judgment. He had owned one of these pieces for over twenty years. He sold one of the pieces for cash after Rubin levied on the property in question, and Rubin released the judgment as to the property sold. He did not tell how much he got for this property. There is no evidence that any of the money received from the sale of this

property was paid to Rubin on account. Bernstein testified that the first he knew of the judgment was from a letter he received from Rubin's lawyer. He went to see Rubin and asked him what he could do. He told Rubin he had a deal for this property and wanted to deliver the property to the purchaser. He saw Rubin often in trying to get a release, but Rubin insisted that he was pressed for money and this was the only way he could protect himself. Bernstein claims he had no knowledge as to the value of two of the pieces of property which he owned. He testified that he was amply solvent but had no money to pay Rubin. He testified he signed the note for $22,000 at Rubin's suggestion, but he did not know that Rubin was a bankrupt in 1926 and that a petition in bankruptcy was then pending against him. He admitted he did not know how much rent the properties bought by them were producing, did not know the size of the lots upon which the buildings were located, never asked for an itemized statement of the money Rubin claimed to have expended for him but knew that Rubin had advanced a lot of money.

The evidence shows that the clearing of the title to the two pieces of property alleged to have been purchased by Rubin and Bernstein has not been successful and considerable litigation is pending with reference thereto, which litigation is not carried on in the name of Bernstein but is carried on in the name of Rubin.

Harry Poticha, who conducts a shoe store in the Halsted street property in controversy, testified that he had a conversation with Bernstein in September, 1928, with reference to the property in question. Bernstein said he had sold the property for $20,000, and thought it was a good deal because he was selling for cash. About two weeks later Bernstein told the witness he would give him a note for $20,000 and the witness was to have judgment entered upon it. Bernstein said his attorney advised him that this was the only way he could get out of the deal; that he did not want to

close the deal and wanted the witness to help him out. The witness refused to comply with the request.

Rubin testified that in June, 1926, he and Bernstein were going to buy the two pieces of property as testified by Bernstein. Bernstein was to advance the money and Rubin was to clear the title, and he spent between $16,000 and $20,000 in clearing the title. They originally bought some claims against the property. It was their intention to clear the foreclosures, and they made arrangements with some of the claimants, who afterwards backed out. Rubin took a deed for the properties in the name of his son. He knew it would take between $25,000 and $30,000 to clear the property, and that was the basis for the amount of the note. He testified that the litigation concerning these two properties was still pending. He told Bernstein about the expenses as he made them but did not render him statements regularly showing how much money he had spent. He testified that at the time he procured the judgment he did not know of any other property owned by Bernstein; that he happened to learn about the property in controversy because Bernstein told him he was selling it. He later admitted he knew Bernstein owned the property in question for about fifteen years and that Bernstein owned other real estate, yet Rubin pretended not to know where this other real estate was located and contends that Bernstein refused to give the location of any other real estate, consequently Rubin had to levy on the property in question. He testified that he asked Bernstein for money frequently; that Bernstein told him he did not have any ready cash but would let him have some soon; that he was selling some property and would see what he could do; that Bernstein never asked his advice about selling the property in question, and he never had a conversation or agreement with Bernstein about a levy on the property to defeat the contract. Rubin admitted he had been doing business with Bernstein since 1913 and they had handled titles together.

It is apparent from all the evidence in this case that the judgment in question was taken to create a lien upon the property solely for the purpose of preventing the transfer. The chancellor was fully justified, under the evidence, in granting specific performance and in holding that the judgment was not a lien on the property so as to prevent the completion of the transfer.

The decree is affirmed.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Partlow is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Decree affirmed.*