Chicago and Alton Railroad Company *et al.*

*v.*

Benjamin Schœneman *et al.*

1. Specific performance—*rests in sound discretion.* It is a settled principle, that a specific performance of a contract is not to be decreed as a matter of course because a legal contract is shown to exist, but it rests entirely in the discretion of the court, upon a view of all the circumstances of the case.

2. Where the effect of a specific performance would be to impose upon the defendants a large expenditure and heavy burden, and inconvenience to public interests, without any practical benefit to the other party, a court of equity, in the exercise of its discretion, will refuse to decree it, and leave such other party to whatever remedy he may have at law for a breach of the contract.

3. Where a railroad company, in consideration of the grant of a right of way over real estate, covenanted with the owners of the land, their heirs and assigns, to construct a draw-bridge on its track at a certain point, and maintain the same, so as to admit vessels from a river through a contemplated slip or canal, and it appeared that owing to an agreement made by certain owners of the land afterwards, the slip or canal to the river could not be made continuous, so as to be of avail for canal purposes to the complainants who had succeeded to a part of the land, so that a draw-bridge would not subserve the end designed by the original contract, and the effect of specifically enforcing the agreement would be to seriously embarrass the railway company in its business, delay trains and endanger their safety, and from the large number of cars and locomotives daily passing over the bridge, would be a serious public detriment, a decree of specific performance against the company was refused.

Appeal from the Circuit Court of Cook county; the Hon. E. S. Williams, Judge, presiding.

This was a bill brought by appellees to compel appellants to construct and maintain a certain swing draw-bridge in conformity with an agreement in that regard.

In the year 1858 the Joliet and Chicago Railroad Company desiring, for the purposes of a railroad, to acquire the right of way over certain premises owned by Daniel Brainard and John Evans, in part as tenants in common, and in part in severalty, entered into an agreement in writing with said Brainard and Evans of the date of March 12th of that year, which had reference to the premises known and described as lots one, two and three of Brainard and Evans' subdivision of block two of the trustees of the Illinois and Michigan Canal subdivision of the south fractional part of section twenty-nine, in township thirty-nine north, range fourteen east of the third principal meridian, and also to lot four, in block twenty-three, in the trustees' of the Illinois and Michigan Canal subdivision aforesaid.

The Archer avenue and the South Branch of the Chicago river may be said to be parallel, and both extend substantially at this point toward the east and west.

Lot one aforesaid lay upon the South Branch of the Chicago river, and extended from that river on the north to Archer avenue on the south, having a street sixty feet wide for its west boundary.   Its east line was the centre of what is known as Healey slough.   The boundary between block two of the Canal Trustees' subdivision (of which lot one was the easternmost portion) and block one was a line passing through the* centre of the site of the slough, the slough itself never having been recognized as a boundary.   Lot two lay immediately to the west of lot one, and lot three immediately to the west of lot two,—both of which lots likewise extended from the Chicago river to Archer avenue.   Lot four in block twenty-three lay to the west of lot three, except that a street intervened.   A map of said premises, including the line of such right of way, was attached to such agreement and made a part of it.

By the terms of the agreement Brainard and Evans conveyed to the Joliet and Chicago Railroad Company a right of way, eighteen feet in width, for the main track of said road, across lot one aforesaid; and Brainard in like manner conveyed a like right of way across lots two and four; and Evans a like right of way across lot three;—all the premises being described by reference to such map, and the right of way being located as represented on the map.

In consideration of such grant the railroad company, among other things, covenanted with said Brainard and Evans, their heirs and assigns, forthwith to properly construct and permanently maintain two swing draw-bridges, one of which should be erected in the line of the main track of the railroad across a slip or canal to be excavated between lots two and three as represented on the map thereto attached, and the other of which bridges should be in like manner constructed across a similar slip or canal, to be excavated at or near the east line of lot one,—both of which bridges should be so constructed as to admit of the easy passage of all vessels and shipping that might enter said slips or canals, and so as not to interfere with the use or usefulness of the slips or canals any further than necessary to open the bridges, and at all times to keep each of the bridges in good repair and out of the way of the business and shipping upon the canals, and so as not to interfere in anywise with any of the business that might be transacted along the banks, shores or wharves of the slips or canals or those adjoining the same.

The company covenanted to take and remove from *said canal or slip*, under the direction of Brainard and Evans, all the earth which might be required by the company for filling, grading and constructing the line of its road lying east of the west line of said section twenty-nine.

It was agreed that all the respective rights and liabilities of the parties should descend to and be binding upon the heirs, executors, administrators and assigns of the parties of the first part (Brainard and Evans) jointly and severally in the one

case, and upon the successors and assigns of the party of the second part (railroad company) in the other case. And that any person or party who might have, at any time, the fee of the premises described in the map, or any part thereof, who might be injured by the breach of any of the covenants, might have a right of action against the party in default, and the same relief in any suit in their own name that any or either of the parties to the instrument might have in like case.

And it was further agreed that if the company should fail to perform its agreement, at the option of Brainard and Evans, their heirs or assigns, the right of way should revert to Brainard and Evans, their heirs or assigns.

Upon the map attached to the agreement but one canal or slip was designated, being a canal or slip to be excavated between lots two and three and extending from the Chicago river nearly but not quite to Archer avenue, being the canal or slip first referred to in that clause of the agreement relating to the construction of swing or draw-bridges. Upon such map the eastern boundary of lot one was represented by a line, and neither Healey slough (so called) nor the site of, nor the length or breadth of any canal or slip upon, or adjacent to lot one, was represented or designated. This agreement, after being executed, was recorded in the office of the recorder of deeds of Cook county July 22, 1858. At the time of the execution of the agreement Brainard and Evans were the owners, as tenants in common, each of an undivided half of lot one. Hough owned the premises lying to the east of lot one and extending from the Chicago river for some sixty feet south of the right of way of the railroad company. Healey owned the premises extending from Hough's land to Archer avenue lying east of lot one, the division line between the premises of Brainard and Evans, or lot one, and those of Hough and Healey, being a line through the centre of the slough.

There was no slip actually in existence, as marked upon the map, at the time the agreement was made. A swing-bridge was soon after, upon the construction of the railroad along

such right of way, erected upon dry land, at the point between lots two and three designated upon the map, and the slip of the character described upon the map was subsequently excavated between lots two and three, and the bridge has been since operated there. A swing-bridge was constructed by the railroad company over the water in the vicinity of the Healey slough, or over the Healey slough, after the execution of the agreement, but never used for the purpose for which it was intended, with the possible exception of three or four times for the passage of small boats. The railroad was constructed in 1858.

In 1857 or 1858 a slip was excavated, extending from the Chicago river to the vicinity of the railroad bridge, and being in part upon the lands of Brainard and Evans and those of Hough, and at or upon, as near as might be, the site of the Healey slough. The slip was docked in 1858, and did not extend to the right of way of the railroad company within some twelve or fifteen feet from the north.

By deed dated September 14, 1862, Brainard and Evans conveyed to Benjamin Schœneman and Samuel Schœneman, the appellees, a portion of lot one, being 100 feet in width and extending in length from the east to the west line of lot one, its north line being 95 to 100 feet south of such right of way, and its south line being 100 feet north of Archer avenue. Also by deed, bearing date September 22, 1862, Brainard and Evans conveyed to John Fitzpatrick another portion of lot one, being a strip 50 feet in width, extending from the east to the west line of lot one and bounded on the south by Archer avenue, leaving between the strip so conveyed to the Schœnemans and Fitzpatrick a strip fifty feet in width, likewise extending from the east to the west line of lot one. The deeds were immediately filed for record in the recorder's office aforesaid.

When the slip last mentioned was about to be commenced, Brainard and Evans owning lot one and Hough owning the land to the eastward and extending south of the railroad right

of way, the latter agreed that Brainard and Evans should have the privilege to excavate the slip back to Archer avenue, *provided* they should make arrangements with Healey to give half of the land owned by him for that portion of the slip to be excavated along the west line of his premises. Healey refused to give the land, and the slip remained, not extending to the railroad right of way from the north, and not excavated south of such right of way until in 1863 or 1864 Brainard, having, by release from Evans, become the owner of lot one, except as to the parts thereof conveyed to the Schœnemans and Fitzpatrick, Brainard and Hough agreed that the slip, as excavated, should be a private slip, and accordingly a map was made of it, showing it to be a private slip, and the map was duly recorded. It was also agreed between Brainard and Hough that the slip should extend no further to the south; and they further agreed with the railroad company to permit it to put up a permanent bridge at the place where the swing-bridge had been constructed over the Healey slough.

On or about January 1, 1864, by lease of that date, the Joliet and Chicago Railroad Company demised to the Chicago and Alton Railroad Company, the appellant, its property and franchises in perpetuity.

On or about September 13, 1864, Brainard and the Chicago and Alton Railroad Company entered into a written agreement of release, bearing that date, and duly recorded October 31, 1864, by which Brainard, in consideration of certain covenants and agreements entered into by that company and therein specified, forever released and discharged the two companies from all obligation to construct and permanently maintain the swing or draw-bridge described in the agreement of March 12, 1858, as "the other of which shall be in like manner constructed across a similar slip or canal to be excavated at or near the east line of said lot one."

A like agreement of release was executed between Evans and the Chicago and Alton Railroad Company on April 13, 1865, and recorded September 11, 1865.

In 1867, Healey, in connection with the Schœnemans, excavated the lands upon the site of the Healey slough, from the railroad right of way to Archer avenue, to a sufficient depth to float vessels if they should pass into it. This excavation was made without cost to them, the clay being taken out for the purpose of brick making.

By deed, dated September 22, 1870, and recorded October 8, 1870, Fitzpatrick conveyed to the Schœnemans that part of the premises aforesaid which had been conveyed to him by Brainard and Evans. In 1873, the Schœnemans purchased of the heirs of Brainard, who had deceased, the remainder of lot one south of the right of way of the railroad, and they are now the owners of all of lot one *south* of the railroad right of way. The deeds executed by Brainard and Evans to the Schœnemans and Fitzpatrick were deeds of warranty and contained only the usual covenants.

The evidence shows that the property of the Schœnemans, being about 300 feet in front, is now worth from $40 to $50 a foot; and that if the same were accessible for boats and vessels, and docked so that vessels could go in and out along its length, it would be worth about $200 a foot. The difference as applied to the 150 feet bought by Schœnemans and Fitzpatrick in 1862 would be about $22,500. The expense or cost of docking is not shown.

It is shown, that the effect on the operation of the Chicago and Alton railroad, if a swing-bridge were constructed across the Healey slough at the point where the present bridge is located, would be to occasion considerable expense and very great delay in operating the road; that an average of about 850 freight and 50 passenger cars and 150 locomotives pass over this bridge each day.

The bill in this case was filed by the Schœnemans on the 19th day of June, 1873, and prays that the railroad companies may be decreed to specifically perform the agreement of March 12, 1858; and to remove the bridge referred to over the Healey slough, and to establish and maintain a swing-

bridge "so that the same may be on all proper occasions drawn so as to permit vessels to pass in and out of and through said canal, slip or Healey slough," etc.

The court below decreed the relief prayed, and the defendants appealed.

Mr. GEO. W. SMITH, for the appellants.

Messrs. ROSENTHAL & PENCE, for the appellees.

Mr. JUSTICE SHELDON delivered the opinion of the Court:

There are various questions presented upon this record. The more prominent one, and that which has principally been discussed in the argument, is, whether or not the agreement of March 12, 1858, created an easement in favor of or appurtenant to the parcels of lot one, bought by the Schœnemans and Fitzpatrick in 1862, so that the covenants therein attached to and ran with such parcels of lot one without respect to other portions of lot one, or whether such covenants were personal to Brainard and Evans; and if the covenants do not strictly run with said parcels, whether the Schœnemans can in equity enforce the same in their name and compel the construction of a swing-bridge at such point as they may elect at or near the east line of lot one, when the owners of premises upon both sides of the Healey slough between a point south of the bridge and the river have, by their agreements of release, precluded themselves from suffering or permitting a canal or slip to be there excavated.

Without passing upon the question, and assuming, for the present purpose, that the appellees can claim and assert for their own benefit, and in their own names, a right in these covenants, we shall consider only whether the case here made is one for the exercise of the jurisdiction of a court of equity. If the canal or slip north of the right of way were now excavated up to the right of way, so that by the excavation through that there would then be a complete and continuous

canal or slip all through from the river to Archer avenue, then, in view of the public inconvenience, there would be a grave question whether the specific performance asked for should be decreed.

The effect of a change in the bridge so as to make it a swing-bridge or a draw-bridge, upon the operation of the railroad, as shown by the proof, would be to seriously embarrass its operation there—delay trains and endanger their safety, and from the large number of cars and locomotives daily passing over the bridge, there is reason to believe there would be serious public detriment in this respect. But passing by this consideration as one to influence the exercise of the discretion which here exists against a decree of specific performance, we proceed to another which will determine our decision. The evidence shows that the canal or slip excavated by Brainard and Hough from the river south, does not extend to the right of way of the railroad; so that if the excavation which appellees have had made south from the right of way should be extended north through the right of way, it would not then reach to the canal or slip on the north, but there would be a space of ground intervening which appellees have no right to intermeddle with. They would have no continuous canal or slip to the river, and theirs would be useless, and the construction of a swing or draw-bridge would be of no benefit to them.

They not only have no right in this intervening space of ground, but Brainard and Hough, the owners, have bound themselves, by agreement, that the canal or slip on the north side shall not extend any further south, and have agreed with the railroad company to permit it to put up a permanent bridge as they have. The object of the swing draw-bridge was to admit the passage of all vessels and shipping from the river that might enter the canal or slip, so as not to interfere with the use or usefulness of said slip or canal, and to keep the bridge out of the way of the business and shipping upon the canal.

But as the canal or slip is not continuous through to the river, nor any likelihood appearing that it will be made so, there will not now be, or hereafter, that we can see, any vessels or shipping from the river to pass the site of the bridge; so that a draw-bridge would not subserve the end designed, or any useful purpose so far as now appears. *Lex neminem cogit ad vana seu inutilia.* Conceding the abstract right of the appellees, it does not follow that a specific performance must be decreed. It is a settled principle that a specific performance of a contract is not to be decreed as a matter of course because a legal contract is shown to exist, but it rests entirely in the discretion of the court upon a view of all the circumstances. *Frisby* v. *Ballance,* 4 Scam. 287; *McCabe* v. *Crosier,* 69 Ill. 501; *Seymour* v. *Delancey,* 6 Johns. Ch. 222. The effect of a specific performance, so far as now seen, would be to impose upon appellants a large burden of expense without any practical benefit to appellees. It resting in sound judicial discretion, it strikes us as a proper exercise of discretion for a court of equity to refuse its interference by way of a decree of specific performance to secure such a result; and that it should leave appellees, for whatever remedy they may have, to their action at law. Entertaining such view, the decree will be reversed, and the cause remanded for further proceedings in conformity with this opinion.

*Decree reversed.*

Mr. JUSTICE WALKER: I hold that the complainants have shown grounds for the relief sought, and that the decree of the court below should be affirmed, or at least that compensation should be allowed them.