GEORGE L. GRAY v. THE CHICAGO, MILWAUKEE AND
ST. PAUL RAILWAY COMPANY et al.

and

GEORGE L. GRAY et al. v. SAME.

*Opinion filed February 20, 1901—Petition dismissed April 4, 1901.*

1. RAILROADS—*when question whether a train is an "accommodation train" should be left to jury.* In ejectment to recover a right of way for breach of the company's covenant to stop all "accommodation trains" at a certain depot, the question whether the train complained of was an "accommodation train" should be left to the jury, unless the evidence is such that all reasonable minds would agree upon such point.

2. SAME—*question whether train is an "accommodation train" is not one exclusively for experts.* The question whether a particular train is an "accommodation train," within the meaning of a right of way conveyance, may as well be determined by other people as by railroad experts.

3. SAME—*condition of right of way conveyance construed.* A condition in a right of way conveyance which provides that the company shall erect a depot on the land and stop all accommodation trains there will be held to be one which will continue so long as the company uses the right of way and runs accommodation trains, and not as one which may be satisfied by performance for a number of years.

4. SAME—*a covenant to stop all accommodation trains is not against public policy.* A covenant in a right of way conveyance to stop all accommodation trains at a depot to be erected at a certain point, cannot be held, as a matter of law, to be illegal and void, as opposed to public policy and contravening the public interest.

5. EJECTMENT—*consideration for conveyance is not a proper subject of inquiry.* In ejectment suits the parties stand on their legal rights, and the consideration for a conveyance is not a proper subject of inquiry.

APPEAL from the Superior Court of Cook county; the Hon. FARLIN Q. BALL, Judge, presiding.

RUBENS, DUPUY & FISCHER, for appellants:

The covenant contained in the deed from Gray is a clear example of condition subsequent. Anderson's Law Dic. 222; 1 Bouvier's Law Dic. 383, 384; *Horner* v. *Railway*

*Co.* 38 Wis. 165; *Railway Co.* v. *Hood*, 66 Ind. 581; *Cross* v. *Carson*, 8 Blackf. 138; *Leach* v. *Leach*, 4 Ind. 628; 10 id. 271; *Scott* v. *Stipe*, 12 id. 74; *Clark* v. *Holton*, 57 id. 564; *Boone* v. *Clark*, 129 Ill. 466; *Mott* v. *Danville Seminary*, 129 id. 403; *Slegel* v. *Lauer*, 148 Pa. St. 236.

There was no possible justification for the action of the court in taking the case from the jury. *Railway Co.* v. *Richards*, 152 Ill. 59; *Railway Co.* v. *Callaghan*, 157 id. 406; *Railroad Co.* v. *Boyd*, 156 id. 416; *Railway Co.* v. *Meixner*, 160 id. 320; *Railroad Co.* v. *Stanley*, 158 id. 396; *Pullman Car Co.* v. *Laack*, 143 id. 242; *Frazer* v. *Howe*, 106 id. 563.

Instructions taking the case from the jury should only be given where the evidence, with all the legitimate and natural inferences to be drawn therefrom, is wholly insufficient, if credited, to sustain a verdict for the plaintiff. *Railway Co.* v. *Richards*, 152 Ill. 59; *Purdy* v. *Hall*, 134 id. 298; *Simmons* v. *Railroad Co.* 110 id. 340; *Pullman Car Co.* v. *Laack*, 143 id. 242.

The real and ultimate issue which was before the court for trial was and is, did the defendants stop all their accommodation trains at Grayland for the purpose of receiving and discharging passengers? It is not denied that train No. 54, as run from June 19, 1892, to February, 1893, did not stop at Grayland. On this much of the controversy the parties agree. Then all that was left to be tried was the question whether or not this train 54 was an accommodation train. Is not this purely a question of fact for the jury, under proper instructions, to determine? Is it not doubly a question of fact, in view of the evidence, that another train, made up in the same way but which stopped at Grayland, is admitted to have been an accommodation train—is even called by the defendants themselves the "Libertyville accommodation?" Each of these trains was made up of milk cars, baggage car and passenger cars, and they were substantially duplicates of each other.

Charles B. Keeler, (George R. Peck, of counsel,) for appellees:

The construction of the term "its accommodation trains," and whether or not the condition is perpetual, are for the court to determine.  *Ogden* v. *Kirby,* 79 Ill. 555; 11 Am. & Eng. Ency. of Law, 518.

This deed must be construed most strongly against the grantor and most favorably to the grantee; and where doubt exists as to its true construction, or if it is susceptible of two interpretations, that one must be adopted which is adverse to the grantor's interest, and the grantee and its assigns may elect the meaning most favorable to them.  *Railway Co.* v. *Tamplin,* 156 Ill. 295; *Boone* v. *Clark,* 129 id. 501; *Sharp* v. *Thompson,* 100 id. 450; *Mortgage Co.* v. *Gross,* 93 id. 499.

Conditions subsequent, which destroy estates, are not favored in the law and must be strictly construed.   It is a general principle running through the whole doctrine of estates upon condition subsequent, that such conditions as go in destruction and defeasance of estates are odious in law and shall be taken strictly.   3 Elliott on Railroads, sec. 943; *Cross* v. *Carson,* 44 Am. Dec. 744; *Voris* v. *Renshaw,* 49 Ill. 425; *Wilson* v. *Galt,* 18 id. 434; 3 Kerr on Real Prop. secs. 1885, 1898, 1901; *Boone* v. *Clark,* 129 Ill. 498; *Board of Education* v. *Trustees,* 63 id. 204.

The meaning and extent of a condition, and the fact of a breach or not, are questions *strictissimi juris,* and the plaintiff, to defeat an estate of his own creation, must bring the defendant clearly within its letter.   He can take nothing by implication.  *Hoyt* v. *Kimball,* 49 N. H. 327; *Lynde* v. *Hough,* 27 Barb. 415.

Thus construed, the requirement that defendant shall stop all "its accommodation trains" at Grayland depot was not a perpetual condition, and cannot be enforced as such regardless of the interests of the public and the railway company.  *Railroad Co.* v. *Barbour,* 89 Ind. 378; *Mead* v. *Ballard,* 7 Wall. 294; *Railway Co.* v. *Marshall,* 136 U. S. 402.

A condition precedent must be strictly and literally performed, but a substantial performance is sufficient if the condition be subsequent. 6 Am. & Eng. Ency. of Law, (2d ed.) 504, 505; 3 Elliott on Railroads, p. 1311, sec. 943; *Cross* v. *Carson*, 44 Am. Dec. 748.

This condition was strictly performed in good faith for a period of eighteen and a half years. That amounted to a substantial performance, in law, and the requirement was at an end, especially as the public interests demanded a change. *Railway Co.* v. *Marshall*, 136 U. S. 402; *Railroad Co.* v. *Barbour*, 89 Ind. 378; *Jenkins* v. *Railroad Co.* 29 Iowa, 255; *Mead* v. *Ballard*, 7 Wall. 294; *Railroad Co.* v. *Rich*, 33 Iowa, 113; *Shaw* v. *Livermore*, 2 Greene, 338.

It is the duty of courts to take, and they will take, judicial notice of the manner in which ordinary railroad business is conducted and of the every-day practical operation of trains. *Railway Co.* v. *Jenkins*, 174 Ill. 402.

Questions of practical railway operation in the management and running of trains, to best serve all the public according to their respective needs, cannot be decided by juries upon their own varying notions or standards. *Railroad Co.* v. *Lonergan*, 118 Ill. 41; *Railroad Co.* v. *Driscoll*, 176 id. 334; *Tuttle* v. *Railway Co.* 122 U. S. 189.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

John Gray owned the east half of the north-west quarter of section 22, in township 40, range 13, in Cook county, and conveyed the southern portion of it to his son, George L. Gray. On January 1, 1874, said John Gray and George L. Gray, then owning the different parts of said eighty-acre tract in severalty, conveyed by warranty deed a strip of land one hundred feet wide and about half a mile long across said tract to the Chicago, Milwaukee and St. Paul Railway Company, a corporation of this State, for right of way of its railway, for the consideration therein mentioned, and the deed contained the following

conditions: "This conveyance is made upon the express conditions that said railway company shall maintain a passenger depot at the place where the passenger depot of said company is now located and erected on said premises, and stop thereat all its accommodation trains to take and leave passengers. In the event the party of the second part, its successors and assigns, shall fail to perform and fulfill all the above requirements and conditions, all the lands above described and herein conveyed to the party of the second part shall revert to the parties of the first part, their heirs, administrators or assigns." The grantee had already built its depot on said land and took possession under the deed, fenced the strip, built its railroad and established the station known as Grayland. On December 12, 1874, the grantee leased its road to the Wisconsin corporation of the same name, and the Wisconsin corporation operated the road down to May 5, 1896, when it took a conveyance of the railroad and railroad property.

John Gray died July 1, 1889, and in February, 1893, said George Gray brought his suit in ejectment against the Chicago, Milwaukee and St. Paul Railway Company, the corporation of this State, and the Chicago, Milwaukee and St. Paul Railway Company, the corporation of Wisconsin, to recover the southern portion of the strip conveyed by him. The devisees of John Gray also brought an ejectment suit against the same corporation to recover the northern portion of the strip which John Gray conveyed. The suits were tried together, and after the evidence was in, the court, on motion of defendants, took the cases from the jury and gave a peremptory instruction to return a verdict in each case for the defendant. Verdicts of not guilty were returned in accordance with the direction. On motions for new trials being overruled, the causes were consolidated and judgment was entered for the defendants. The action of the court in taking the cases from the jury and ordering verdicts for the defendants is the principal ground of complaint.

It was stipulated at the trial that John Gray was the common source of title of both parties, and that the grantee in the deed had at all times maintained a passenger depot on the lands in controversy at the place provided in the deed. Plaintiffs sought to recover the land upon the ground that the other condition of the deed had been violated by failing to stop an accommodation train at the station to take and leave passengers. In support of their claim they introduced in evidence a number of time-cards showing a train under the head of "First class, No. 54 passenger," giving the time and stops from Western Union Junction to the passenger station at Chicago. The first time-card was No. 15, which took effect May 8, 1892, when the train was first put on, and it was scheduled to stop at all the stations, either regularly or upon signal, and was due at Grayland at 9:51 A. M., to stop only on signal. The next time-card, No. 16, took effect June 19, 1892, and the train ran upon the same time, leaving Western Union Junction at 8 A. M., stopping at most of the stations and arriving at Chicago at 10:15 A. M., but it did not stop at all at Grayland, and never stopped there afterward. Plaintiffs claimed that this train No. 54 was an accommodation train, and under the condition of the deed defendants were bound to stop it at the station to take and leave passengers.

The evidence as to the character of the train was as follows: It was put on May 8, 1892, and started at Beloit, Wisconsin. It carried passengers and also took up milk at stations from Delavan, Wisconsin, to Western Union Junction, Wisconsin, where it divided, part going to Milwaukee and part south to Chicago. The train for Chicago was composed of a baggage car, three milk cars and two passenger coaches. It made regular stops and took on milk and passengers down to and including Warrenton, Illinois, 36.8 miles from Chicago. The second time-table, No. 16, went into effect June 19, 1892, and the train made regular stops as far as Forest Glen, two miles

from Grayland, which was the last stop. Grayland is 8.2 miles from the passenger station in Chicago and 5.4 miles from Western avenue. Forest Glen, where the last stop was made, was 10.2 miles, and Warrenton, the last stop where milk was taken on, 36.8 miles from the Chicago station. From Forest Glen this train ran without stopping to Western avenue, where the train was divided, the baggage car and passenger cars going to the passenger station and the milk cars being handled by another engine. After leaving Warrenton, where the last milk was taken on, the train made six stops for passengers in twenty-six miles, at stations averaging about four miles apart. This time-table was in force until August 7, 1892, and from that time there were four time-tables up to the time when these suits were commenced, in February, 1893. Under these latter time-tables the train did not stop south of Warrenton except for grade crossings, but it ran on substantially the same time and passed Grayland at about the same time in the morning. The train went north as No. 53 with the empty milk cans and made all the stops. There was a train No. 32, from Liberty-ville to Chicago, that was due at Grayland at 8:34 A. M. and reached Chicago at 9, and this was the only train stopping in the morning at Grayland after June 19, 1892.

The action of the court in refusing to submit the issue to the jury and in directing the verdict is claimed to have been justified on several grounds. The first of these is that the condition was not broken, because train No. 54 was not an accommodation train for Grayland and vicinity after June 19, 1892, within the meaning of the condition of the deed. If the evidence was such that the only conclusion in all reasonable minds would be that the train was not an accommodation train, the court might direct the verdict, otherwise not. The train was designated on the time-tables as a first-class passenger train, but the witnesses for defendants called it the milk train, and the evidence showed that it was put on in response

to the demand for a train that would carry milk to Chicago. Of course, the fact that the train carried milk would not deprive it of its character as a passenger train. Such trains carry not only passengers, but mails, baggage and perishable goods, which must be handled with dispatch. A train does not cease to be a passenger train because it also carries poultry, veal, eggs, milk or other things requiring dispatch and quick delivery. This train had two passenger cars, did a passenger business and was a passenger train. Some railroad experts testified that it was not an accommodation train and never known · as such; but the question what was meant by an accommodation train in the sense used by the parties to the deed can be solved as readily by other people as railroad experts. Transportation by railroads has become the most common of any kind, and in matters where railroads are brought into constant and common relation with the public the people generally are as well informed as experts. There are matters of skill and science in the operation of railroads, but names and characters of trains do not belong to that class, and the meaning of a term in such common use as an accommodation train is generally, if not universally, known. Webster defines it to be "one running at moderate speed, and stopping at all, or nearly all, stations." Passenger travel is partly local from station to station and for different distances along the route, as well as to the destination of the train. Through trains and limited trains do not meet the demands of such travel, and in the general understanding, an accommodation train is one designed to accommodate the public in that respect and arranged to stop at most of the stations to effect that object.

The argument that the train in question was not an accommodation train for Grayland and vicinity after the issue of time-card No. 16, on June 19, 1892, is on the further ground that, although it stopped at all the other stations for the accommodation of passengers before

reaching Grayland for a distance of fifty-one miles, it then became a through train for the remaining distance. From the last stop at Forest Glen to Western avenue is a distance of about seven miles, in which there are four stations, including Grayland, where the train did not stop. Probably no one would deny that a train could be an accommodation train on part of its run and then become a through train. Such a change in the character of a train would be entirely reasonable and consistent with the meaning of the term "through train." But no condition existed in this case which could justify such a claim. If the alleged change took place, it was only two miles before this train reached Grayland, and the next stop was at Western avenue, a few miles further on, and to say that it became a through train would amount to saying that whenever an accommodation train runs through a station without stopping it is a through train as to that station. It cannot be said that the evidence did not present a fair question for the jury as to whether the train was an accommodation train, and the court was not justified in taking the case from the jury on the ground that it was not such a train as was embraced in the condition.

The next argument presented as a justification for taking the case from the jury is that the condition was not perpetual; that it had been performed for eighteen and a half years, which amounted to a substantial performance, and was long enough to satisfy the condition. It is true that a substantial performance of a condition subsequent is sufficient and that the rule of strict construction is to be applied to the condition. If the condition is restrictive of natural rights, it will not be held to be perpetual unless the intent to make it so is clear. The conveyance in this case was upon the express condition that the grantee should maintain the passenger depot and stop thereat all its accommodation trains to take and leave passengers. It could not have been in the contem-

plation of either of the parties that Gray and his heirs
should not have the benefit of the condition while the
grantee should hold and have the use of the land, or that
the condition would be discharged by a performance dur-
ing a portion of such period. The undoubted meaning of
the parties was, that so long as the grantee should have
the land for its railroad and run accommodation trains
the trains should be stopped. We cannot adopt the views
of appellees' counsel and hold that the condition was dis-
charged or that the court could direct a verdict on that
ground.

Another position assumed by appellees' counsel is,
that if the condition is construed to be perpetual it is
illegal and void because opposed to the policy of the
State and contravening the public interest, and that de-
fendants can hold the land free from such invalid con-
dition. The performance of a condition subsequent is
unnecessary where it is opposed to positive law or pub-
lic policy, and the performance of such a condition may
be excused. (3 Elliott on Railroads, sec. 941.) If an es-
tate has vested and the condition upon which it is to be
divested is void as against public policy, the estate will
be freed from the condition, as where a railroad company
agrees to not establish a station within a certain dis-
tance, so as to disable itself from performing its duty
by establishing a station where the public convenience
may require. (St. Louis, Jacksonville and Chicago Railroad
Co. v. Mathers, 71 Ill. 592.) It was also held that a court
of equity would not interfere to enforce the specific per-
formance of a contract to locate a depot at a certain
point in a town, "and at no other point in said town."
The specific enforcement of a contract is not a matter of
absolute right, but of sound discretion in the court, and
it was said that the location of a depot has much to do
with the convenience of the public, and a change of af-
fairs may require a change of location. While the court
did not hold that the contract was void, it left the com-

plainant for whatever remedies he might have to his suit at law for damages. (*Marsh* v. *Fairbury, Pontiac and North-western Railway Co.* 64 Ill. 414.) In those cases the effect of the agreements was that the railroad companies would not discharge their duty to the public. The condition in this case does not require the railroad company to stop limited trains, through trains or express trains at this station, so as to operate injuriously to the traveling public requiring trains of high speed for long distances. It is an agreement to stop accommodation trains put on the road for the very purpose of accommodating small stations and local travel. We are unable to see how the general tendency of a contract of this kind could operate injuriously to the public. If a railroad company runs an accommodation train, we do not understand how it could injure or destroy the public interest or the common welfare to agree that it should accommodate travel by stopping at a particular station. The defendants are in no way hampered or restricted by the agreement in furnishing accommodations to people north of Grayland. If the condition should be enforced, the access of the public to the city of Chicago would not be cut off, but defendants would have to condemn the right of way and pay the just compensation that might be awarded therefor. The court would not be authorized to say, as a matter of law, that the condition was illegal and void.

Appellants complain that the court excluded evidence that Gray owned a large tract of land at this station which he subdivided, and that the motive of the deed was to aid that subdivision. In ejectment suits the parties stand on their legal rights, and the consideration of a conveyance is not a proper subject of inquiry. The ruling was not erroneous.

The judgment is reversed and the cause is remanded.

*Reversed and remanded.*