JOHN FARSON *et al.*

*v.*

SIMON F. FOGG *et al.*

*Opinion filed October 26, 1903—Rehearing denied December 4, 1903.*

1. SPECIFIC PERFORMANCE—*specific performance is not a matter of right.* Specific performance of a contract will not be decreed as a matter of course even though a legal contract is shown to exist, since such relief rests in the sound discretion of the court, upon consideration of all the circumstances.

2. SAME—*street railway company cannot be compelled to perform contract to pave street.* A street railway company cannot be compelled to perform a contract made by it with a property owner to pave a street, independently of any consent or authority from the city.

3. SAME—*when defendant is not estopped to raise defense of ultra vires.* A contract by a street railway company with a private party to pave a street, without regard to the action of the city, is *ultra vires* in the proper sense, and the company is not estopped, by having received the benefits of the contract, to make such defense to a bill for specific performance.

4. SAME—*decree for damages is ancillary to the relief granted.* A decree for damages under a bill for specific performance is ancillary

to the granting of the relief prayed, and hence, if no ground for such relief is shown, equity will not decree damages.

5. SAME—*when bill will not be retained to decree damages.* A bill for specific performance will not be retained for the purpose of decreeing damages for breach of the contract, where the complainant, at the time of filing the bill, knew the defendant had no power to make the contract and that it could not be enforced.

*Farson* v. *Fogg,* 105 Ill. App. 572, reversed.

APPEAL from the Branch Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. R. W. CLIFFORD, Judge, presiding.

This is a bill, filed in the circuit court of Cook county on July 21, 1897, against the Calumet Electric Street Railway Company, John Farson, Arthur B. Leach, Levi H. Fuller, John C. McKeon, and Idea L. Hammond, administratrix of William A. Hammond, deceased, for the purpose of enforcing the specific performance of the following agreement, to-wit:

"This memorandum of agreement, made and entered into by the undersigned this 17th day of September, A. D. 1895, witnesseth:

"That whereas, the Calumet Electric Street Railway, a corporation, has made application for a franchise or a license to build a one or two-track electric railway on Cheltenham Place from the easterly line of Bond avenue to a point four hundred and eighty feet easterly therefrom, in Chicago, Illinois; and whereas, the said corporation has agreed with the undersigned, Simon F. Fogg and William C. Kinney, who are the owners of lots 172, 173, 174 and 175 in Westfall's subdivision, etc.,   *   *   * and the eighty feet in width east of and adjoining said lots 172 and 174, to cut, grade, curb, macadam and build the cross-walks in said Cheltenham Place from curb to curb from said Bond avenue to said point, the work to be of uniform width throughout, according to the speci-

fications hereto attached and hereby made a part hereof, in consideration for, and in full payment of, the damages which said Fogg and Kinney will incur in connection with, and by reason of, the construction of said railway on said Cheltenham Place, if the said corporation shall secure said ordinance; and whereas, the undersigned, Farson, Leach & Co., being interested in said corporation and in the securing of said franchise and the construction of said road, to secure the faithful performance of said agreement by said corporation on or before September 1, 1896, if it shall secure said franchise in the meantime, have placed their certified check for $1000.00, drawn upon the National Bank of Illinois, and made payable to William A. Hammond, vice-president, as trustee, to secure the faithful performance of said agreement;

"Now therefore, in consideration of the premises, it is mutually agreed between the undersigned that, if said corporation shall complete said cutting, grading, curbing, macadamizing and cross-walks according to the specifications hereto attached as aforesaid, on or before September 1, 1896, the said William A. Hammond, shall, when said work is fully completed according to said specifications, return said check to said Farson, Leach & Co. If said corporation shall not secure the said franchise or license and shall have withdrawn its application therefor, and returned to said Fogg and Kinney their petition to the city council to grant said franchise or license to said corporation, then said check shall be returned to said Farson, Leach & Co. If said corporation has acquired on or before September 1, 1896, said franchise or license, and neither it, nor the said Farson, Leach & Co. has completed said work according to said specifications, said check shall thereupon be endorsed by said Hammond, or his successor as vice-president of said bank, and delivered to said Fogg and Kinney by said Hammond or his successor, and said bank shall pay the same to said Fogg and Kinney upon said endorsement when made

by said Hammond or his said successor, and said Fogg and Kinney shall have and hold said sum of $1000.00 as and for liquidated damages for the failure of said corporation or said Farson, Leach & Co. to do said work. The said work shall be done in accordance with said specifications to the satisfaction of said Fogg and Kinney. In case said company be restrained by any court from proceeding as above specified, then the time to complete said work, shall be correspondingly extended, but not in all longer than ninety days from September 1, 1896.

"This agreement shall be binding upon the heirs, representatives and assigns of the undersigned.

"In witness whereof, the undersigned have hereunto set their hands and seals the day and year first above written.

SIMON F. FOGG,        [Seal.]
WILLIAM C. KINNEY,        [Seal.]
Per SIMON F. FOGG.        [Seal.]

"The Calumet Electric Street Railway Company for value received hereby acknowledge that it has agreed to do said work according to said specifications, as in the foregoing memorandum is stated, and upon the conditions therein recited.

CALUMET ELECTRIC STREET RAILWAY CO.
JOHN FARSON, *Gen. Manager.*"

The specifications, attached to the contract, provide that, whenever cutting occurs, the earth must be excavated to such depth as the engineer may direct, and the surface graded to stakes to be given by him; that, before paving, the street should be graded to conform to stakes or profiles to be given by the engineer in charge, and thoroughly flooded, rammed and rolled, to give it a solid bed; that on the road-bed thus formed and completed will be spread a layer of clean, broken stone entirely free from dust and dirt, not less than ...... in depth in the center, and not less than ...... at the sides after being thoroughly rolled; that the stones shall be practically uniform in quality, etc.; that on the above layer shall

be spread limestone screenings, or bank gravel, as designated by the commissioner of public works, in sufficient quantities to fill up all interstices, and then flooded and rolled, etc.; that the above to be covered with medium limestone, etc.; the interstices to be filled with limestone screenings or bank gravel and flooded; that this layer shall not be less than ...... in depth at the sides and not less than ...... at the center, after being thoroughly rolled; that the cubes shall be of best quality of oak plank, three inches in thickness by fourteen inches in width, etc.; that there shall be four cross-walks at each street intersection, three at each half intersection, and one at each and every alley, to be constructed of Ottawa or Grape Creek paving brick, or brick of equal quality and shape; that the brick shall be equal in quality to standard samples in the office of the commissioner of public works, the cross-walks to be formed under the direction of the engineer in charge of the street and to be six feet in width; that the brick must be laid in uniform courses, etc.; that when laid the pavement shall immediately be covered with clean, dry, sharp sand in proper quantities and swept until all joints become filled therewith, etc.; that no broken or cracked brick will be allowed to remain in cross-walks; that all cross-walks and their appurtenances shall be constructed by the contractor without any extra charge for the same over and above the price bid per lineal foot for macadam.

A joint and several answer was filed to the bill by the Calumet Electric Street Railway Company, John Farson, A. B. Leach, Levi H. Fuller and John C. McKeon. The answer sets up, that the National Bank of Illinois was in the hands of a receiver, and that John McNulta was such receiver. Accordingly, on May 7, 1898, the appellees, complainants below, filed a supplemental bill making John McNulta, receiver of the National Bank of Illinois, a party defendant. John McNulta, receiver of the National Bank of Illinois, filed an answer.

It also appeared from the answers that the Calumet Electric Street Railway Company was in the hands of a receiver, but such receiver was not made a party to either the original or supplemental bill.

The cause, after being at issue, was referred to a master in chancery, who made findings substantially in accordance with the prayer of the bill. The master's report, after objections and exceptions thereto, was confirmed by the court and the final decree entered on March 22, 1901. An appeal was taken from this decree to the Appellate Court, and the decree of the circuit court was affirmed. The present appeal is prosecuted from such judgment of affirmance.

The material facts, as gathered from the pleadings and proofs, and from the master's report, and the decree of the court, are substantially as follows:

The premises in question were owned by appellees, Fogg and Kinney, but the legal title was in Fogg, Kinney owning the equitable title to an undivided half of the premises. The premises owned by appellees were on the south side of Cheltenham Place, and fronted toward the north thereon four hundred and eighty feet. That is to say, the whole frontage of the block on the south side of Cheltenham Place between Bond avenue and Lake avenue was the property of appellees. The Calumet Electric Street Railway Company, (hereafter called the Calumet) had applied to the common council of the city of Chicago for a license or ordinance to lay tracks on Cheltenham Place in front of the property of appellees. The evidence tends to show, that the South Chicago City Railway Company, (hereafter called the South Chicago), was also seeking a right of way on Cheltenham Place between Bond and Lake avenues, which was one block. No franchise could be obtained from the city to construct and operate a railway on said street without the consent of the appellees. Farson and Leach

were co-partners under the name of Farson, Leach & Co. and interested in the Calumet. About September 18, 1895, Fogg, representing the appellees, and Leach, representing the corporation, and Farson, Leach & Co., placed a duplicate of said agreement and a check or order for $1000.00 in the hands of said Hammond in said National Bank in trust, and told Hammond that the check was delivered to him in trust for the carrying out of the said agreement between the parties, and Hammond received the papers in trust for such purpose. The bill alleges that the check for $1000.00 was signed by Levi H. Fuller, by the name of L. H. Fuller, and addressed to Farson, Leach & Co., dated September 18, 1895, requesting Farson, Leach & Co. to pay to the order of W. A. Hammond, $1000.00, and duly certified and accepted by Farson, Leach & Co. The check, thus described in the bill, differs from the check described in the agreement. The bill alleges that the Calumet secured the ordinance for laying down its tracks on September 1, 1896, and was not restrained from doing so by any court. Appellees, on December 11, 1896, notified Hammond that the paving had not been done, and requested him to endorse and deliver the certified check to them, the appellees. On December 21, 1896, the National Bank of Illinois became insolvent and one John C. McKeon was appointed receiver under the laws of the United States, and as such receiver was succeeded by John McNulta. On December 31, 1896, appellees again notified Hammond in writing that the work had not been done and claimed the check, and requested him to endorse and deliver it to them. Hammond stated that he had delivered the check to the bank. The National Bank of Illinois had no interest in the check, and the proof shows that it was in the hands of one Frost, who acted as clerk for McNulta, the receiver. Hammond died on January 2, 1897. The check was produced upon the trial from the hands of Frost. Neither Farson, Leach & Co., nor the Calumet railway

company, have done anything towards the paving of said street or the payment of the $1000.00. The Calumet company has placed wires and tracks in Cheltenham Place, and is operating electric cars thereon.

The bill alleges, that appellees claimed that they would incur damages to their property by reason of the construction of the railway on Cheltenham Place, and that the street was to be paved, or the $1000.00 to be paid in consideration for and in full discharge of said damages.

The answers deny that the contract was executed for the purpose of compensating appellees for the damages expected to be incurred to their property. The answers charge, that the appellees combined with the South Chicago company, and with others, to extort money from the Calumet company, and prevent the latter from obtaining from the common council of the city an ordinance for building and operating an electric railway in Cheltenham' Place; that appellees claimed that the South Chicago company had offered them pecuniary inducements not to sign for the frontage of the property owned by them in favor of the Calumet company, but to give to the South Chicago company their signature of frontage to a petition to the city of Chicago for the right to build a railway on Cheltenham Place; that appellees declared that, unless the Calumet company would do better by them than the South Chicago company, appellees would not sign their frontage to a petition for the Calumet company; that thereupon appellees presented to the officers of the Calumet company a draft of the contract, substantially such as that which is set out in the bill of complaint, stating that the terms of said contract were the only terms, on which they would sign a petition for the frontage, which they claimed to own on Cheltenham Place in favor of the Calumet company for an ordinance, granting them the right to lay tracks and operate a railway thereon; that they stated that they insisted upon

the contract in that form, because it was illegal, and contrary to public policy, and against good morals, for them to contract for a sale of their signatures and consents to the frontage of the property, which they claimed to own; that the officers of the company declined to sign said contract, but that Farson, its general manager, made the endorsement thereon as above set forth. The answer charges that the consideration for the signing of the contract by the company was the signing by appellees of the petition, addressed to the city council to give the Calumet company the right to lay its tracks on Cheltenham Place in front of the property of appellees. The answers charged that the firm of Farson, Leach & Co. are not made parties defendant to the bill, and that the receiver is not made a party.

The answer admits that the Calumet company has received its right to the use of Cheltenham Place for its electric road from the city of Chicago under an ordinance passed by the common council. The answer denies that there is any need of a pavement upon Cheltenham Place, which is near the lake, and full of sand, and called in the answer a street *de soc.*

The answer also sets up that the engineer, mentioned in the specifications, never gave or furnished to appellants, or the Calumet company, any grade stakes or profiles, as therein specified, and that the engineer of public works never had any samples of brick in his office, and never gave any directions for the laying of the cross walks, as stated in the specifications, and that, therefore, appellants were never able to comply with the conditions of the contract; that the layer of clean, broken stone was not specified to be of any particular depth, either in the center, or at the sides, and that the contract was so indefinite and uncertain in its terms, that it was impossible for appellants to carry the same out, so that a specific performance thereof could not be decreed by the court.

The answer also sets up, that the contract is contrary to public policy, in that by its terms the appellees assume jurisdiction over the public domain, and to take from the city of Chicago, having jurisdiction over the street in question, the power of controlling and maintaining the thoroughfare called Cheltenham Place; that the contract is in violation of the city ordinance, which provides that no individual or corporation shall, without the consent of the city, improve in any way or change the condition of its public thoroughfares; and that there never has been any ordinance or license, passed by the city, to the appellees or any other persons to make the improvement contemplated by the contract, and that, therefore, the contract is void; that, when it was made, the appellees well knew that there was no ordinance authorizing the paving of Cheltenham Place in the manner therein specified, and that, until such ordinance was passed by the city, the improvement could not be made. The answer also charges that the appellees cannot compel the specific performance of the contract, and that there is no ordinance, by which it can be lawfully carried out, and that to carry out the same would be a violation of law and a breach of the peace.

The final decree, rendered by the lower court, found that the contract had not been performed by the Calumet company, but that they had failed and refused to perform it, and that appellees were entitled to have from Farson and Leach $1000.00 with interest at the rate of five per cent per annum from September 1, 1896, amounting to $1227.00; that the check or draft for $1000.00 was intended to be held in escrow by Hammond to be delivered to appellees in case they became entitled to have the same from Farson, Leach & Co.; that Hammond died before this bill was filed, and that appellees had never received the draft, although they had demanded it from Hammond in his lifetime, and after his death from the

person into whose hands it came. The decree holds that, upon payment by Farson and Leach of the $1000.00 to appellees, the check should be canceled and vacated and Farson, Leach & Co. entitled to receive possession of it. The decree then orders that Farson and Leach pay appellees within five days $1227.00, with interest from the date of the decree, and that Farson, Leach and the Calumet company pay the costs of the suit, etc.

JUDSON F. GOING, (DANIEL V. GALLERY, of counsel,) for appellants:

A court of equity will not entertain a bill to specifically enforce a contract, the enforcement of which requires a succession of acts and which would require supervision and control. *Becks* v. *Allison,* 56 N.Y. 336; *Coal Co.* v. *Spellman,* 39 Ill. App. 630; *Harley* v. *Sanitary District,* 54 id. 337; *Sellers* v. *Greer,* 172 Ill. 558; *Construction Co.* v. *Naugle,* 70 Ill. App. 384; Story's Eq. Jur. pars. 726, 727.

Where a contract is made the consideration for the sale of frontage consents, or is made in an attempt to do indirectly what cannot be done directly, or is an agreement to influence the city council, it is illegal and void, as against public policy. *Doane* v. *Railway Co.* 160 Ill. 22; *Wells* v. *People,* 71 id. 532; *Critchfield* v. *Paving Co.* 174 id. 466.

The fee of the streets is in the city of Chicago, and it is exclusively for the corporate authorities to determine when the streets shall be paved, how they shall be paved and by whom that shall be done. *Ottawa* v. *Walker,* 21 Ill. 605; *Chicago* v. *O'Brien,* 111 id. 552; *Gridley* v. *Bloomington,* 88 id. 554; *Railway Co.* v. *Railway Co.* 66 Ill. App. 362; *Murphy* v. *Peoria,* 119 Ill. 509.

Where the gist of the action is damages for the breach of a contract, and no other relief is asked for, there is a full, complete and adequate remedy at law and equity will decline to entertain jurisdiction. In such an action, if relief in equity is sought, it must be alleged and proved that the remedy at law is incomplete and that a resort

to equity is necessary. *Fuller* v. *Davis,* 184 Ill. 505; 84 Ill. App. 295; *County of Cook* v. *Davis,* 145 Ill. 151; *Werner* v. *Graham,* 107 id. 169; *Hale* v. *Bryant,* 109 id. 43; *Thomas* v. *Caldwell,* 50 id. 138; *Doane* v. *Murphy,* 33 id. 227; *Stewart* v. *Mumford,* 80 id. 192; *Railway Co.* v. *Nichols,* 57 id. 464; *Mack* v. *McIntosh,* 181 id. 633.

ALEXANDER S. BRADLEY, for appellees:

· The contention that the consideration for the contract was a secret and disguised one, and against public policy, must be set up in the answer, since the written contract sued on shows a valid consideration. *Bangs* v. *Hornick,* 30 Fed. Rep. 97; *McDearmont* v. *Sedgwick,* 140 Mo. 182; *Vogle* v. *Ripper,* 34 Ill. 108.

Even if this had been a contract to pave a street in consideration of signing a frontage petition, it would not be against public policy, but for the public interest. Contracts should not be adjudged illegal, as against public policy, unless clearly injurious to the public welfare. 15 Am. & Eng. Ency. of Law, (2d ed.) 934; *Lyman* v. *Railroad Co.* 190 Ill. 320; *Gray* v. *Railway Co.* 189 id. 400; *Critchfield* v. *Paving Co.* 174 id. 477; *Railway Co.* v. *Railway Co.* 66 Ill. App. 376.

The fact that the city controls the streets and paving, does not make a contract of a street railroad or a citizen to do paving illegal or impossible. A person who contracts with a railroad corporation or private person that the latter shall do paving, has a right to expect that it is or will be in the power of the latter to do it. 1 Parsons on Contracts, 461.

Mr. JUSTICE MAGRUDER delivered the opinion of the court:

The appellees claim that the contract of September 17, 1895, here in controversy, was executed for the purpose of compensating them for the damages, which they expected that their land, fronting on Cheltenham Place,

would suffer from the laying down of the tracks of the Calumet Electric Street Railway Company upon said place. The testimony, introduced by appellees, tends to sustain this contention; and the contract itself recites that the Calumet company agreed to pave the street in payment of the damages, which appellees would incur by reason of the construction of the railway upon the street in front of their property, in case the company should secure an ordinance permitting them to lay down their tracks there. On the contrary, the appellants claim that the real consideration of the contract was the signing by appellees of the petition of the Calumet company to the common council for permission to lay down the tracks. In other words, the appellants contend that they were to pay $1000.00 to appellees for signing their consent to have the tracks laid in the street, and that the written contract, specifying that the consideration was the damage expected to arise, was so expressed for the purpose of covering up the fact that appellees were selling their consent. The testimony of the appellants strongly tends to sustain this contention. There is much upon the face of the contract itself to suggest the theory contended for by the appellants. The contract states that application had been made by the Calumet company to the city for a license to build a track on Cheltenham Place. Both parties must have known, and did know, that, under the law, the city council had no power to grant the right to the Calumet company to lay the tracks down in Cheltenham Place, except upon the petition of the owners of the land, representing more than one-half of the frontage of the street, or so much thereof as was sought to be used for railroad purposes. The appellees owned all the frontage amounting to four hundred and eighty feet on the south side of the street. As we understand the evidence, the part of the street, where the tracks were to be laid, was only the length of one block, so that half of the frontage was owned by the appellees.

The contract provides that, "if said corporation shall not secure the said franchise or license, and shall have withdrawn its application therefor and returned to said Fogg and Kinney their petition to the city council to grant said franchise or license to said corporation, then said check shall be returned to said Farson, Leach & Co." It thus appears that Fogg and Kinney did give to the Calumet company, or to Farson and Leach for it, their consent to the laying of the tracks.

But while there are many circumstances disclosed by the evidence, and much that appears upon the face of the contract itself, tending to create the suspicion that the parties were trying to avoid the effect of the decision of this court in the case of *Doane* v. *Chicago City Railway Co.* 160 Ill. 22, yet we are not prepared to say that the evidence is clear and convincing as to the contention of either party upon this question. We, therefore, pass no opinion upon it.

There is another ground, however, pleaded in the answers and pressed upon our attention in the argument filed in behalf of appellants, upon which, in our opinion, the relief, prayed for in the bill in this case, ought to have been denied.

The Calumet Electric Street Railway Company agreed with the appellees to pave Cheltenham Place, a public street in the city of Chicago, for some consideration, which was supposed to operate for the benefit of appellees. The Calumet company is shown by the proofs to be in the hands of a receiver, and that receiver is not a party to the suit. Waiving, however, the question, whether it was necessary to make the receiver a party or not, we are of the opinion that the Calumet Electric Street Railway Company had no power to make any such agreement. Nor has a court of chancery the power to decree the specific performance of any such agreement. It is a well settled doctrine in this State, that a city holds the title to its streets in trust for the public, and

cannot turn over such streets to private parties to be improved. The power to control and improve the streets in the city of Chicago is vested in the city itself, or in its common council.

The seventh paragraph of section 63 of article 5 of the City and Village act, which was in force in 1895 when the contract here under consideration was made, provides that "the city council in cities, and the president and board of trustees in villages, shall have the following powers: * * * *Seventh*—To lay out, to establish, open, alter, widen, extend, grade, pave or otherwise improve streets, alleys, avenues, sidewalks, wharves, parks, and public grounds, and vacate the same." By the ninth paragraph of the same section, the city council has power to regulate the use of the streets, by the sixteenth paragraph of the same section to provide for and regulate cross-walks, curbs and gutters, and, by the twenty-fifth paragraph of the same section, to provide for and change the location, grade and crossings of any railroad. (1 Starr & Curt. Ann. Stat.—2d ed.—pp. 689, 692, 694, 696, 697). The power, thus conferred upon the city council, to pave, grade, curb, improve, and regulate the streets and cross walks is vested exclusively in the city council, and can not be shared by it with any other body or person. It is obvious from the various provisions above referred to of the City and Village act, that the control of the streets and the power to improve them, which are placed in the hands of the city council, are left to a large extent to the discretion of that body. The exercise of these powers is so far discretionary, that the mode of their exercise depends upon the will of the city council. (*Town of Ottawa* v. *Walker*, 21 Ill. 605; *Murphy* v. *City of Peoria*, 119 id. 509; *Gridley* v. *City of Bloomington*, 88 id. 554; *City of Chicago* v. *O'Brien*, 111 id. 532).

"In a bill for specific performance the contract must be of such a character that the court is able to make an efficient decree and enforce it when made." (3 Pomeroy's

Eq. Jur. sec. 1405; *Sellers* v. *Greer*, 172 Ill. 549). It is diffi-
cult to see how a court of equity could enforce the con-
tract involved in the case at bar. If it should require
the Calumet Electric Street Railway Company to pave
Cheltenham Place, it would require it to take possession
of a public street, which belongs to the city and is held
in trust by the city for the use of the people. To order
the Calumet company to take possession of this street
would be to order it to create an obstruction in a public
street, and clothe an outside corporation with the power
which the law vests in the municipality. It is well set-
tled, that the specific performance of a contract will not
be decreed as a matter of course, even though a legal
contract is shown to exist. But such specific perform-
ance rests entirely in the discretion of the court upon a
view of all the circumstances. (*Chicago and Alton Rail-
road Co.* v. *Schoeneman*, 90 Ill. 258). In *Gray* v. *Chicago,
Milwaukee and St. Paul Railway Co.* 189 Ill. 400, it was said:
"The specific enforcement of a contract is not a matter
of absolute right, but of sound discretion in the court."

It is true, that the common council, in granting leave
to a street railway company to lay its tracks in the
street, sometimes imposes, as a condition, that the street
railway company shall keep the street between its tracks
paved; and, perhaps, the common council might make it
a condition that the street railway company should keep
more of the street than lies between its tracks paved
and in repair. But a street railway company has no
power, by virtue of its own charter, to pave the streets
of the city outside and independently of the consent of
the city itself. There is no provision in the present con-
tract, that the company was to procure or obtain an or-
dinance from the city, permitting it to pave the street.
On the contrary, the contract provides as follows: "The
said work shall be done in accordance with said speci-
fications to the satisfaction of said Fogg and Kinney."
The paving was not to be done, under the provisions of

the contract, to the satisfaction of the city or its officers, but it was to be done to the satisfaction of these appellees, private parties having no control over the street itself. Even if the contract was a valid one, the specifications, as charged in the answer, are indefinite and uncertain in many of their provisions. The engineer who, by the terms of the specifications, is to give directions as to the paving, is not necessarily the city engineer, nor does it appear whether he is to be an engineer employed by the Calumet company, or by the appellees.

An offer was made, upon the hearing of the cause below, to produce in evidence the charter of the Calumet Electric Street Railway Company for the purpose of showing that it had no power, by the terms of its charter, to engage in the paving of public streets. The charter might well have been admitted, but, independently of any provisions of the charter, it must be true that a street railway corporation, organized under the laws of Illinois as the Calumet company is shown to be, has no power from the very nature of its organization to engage in the business of paving streets. This contract, therefore, was *ultra vires* the Calumet Electric Street Railway Company. In *National Home Building Ass. v. Home Savings Bank,* 181 Ill. 35, it was said: "A contract of a corporation which is *ultra vires* in the proper sense,—that is to say, outside the object of its creation as defined in the law of its organization, and therefore beyond the powers conferred upon it by the legislature,—is not voidable only, but wholly void and of no legal effect." It was held in the case last cited, that the rule, that a corporation is estopped to make the defense of *ultra vires* where it has received the benefit of the contract, applies only to cases where the contract is within its power but there has been a failure to comply with some regulation, or there has been an improper exercise of the power. It was there said: "If there is no power to make the contract, there can be no power to ratify it, and it would seem clear that

the opposite party could not take away the incapacity and give the contract vitality by doing something under it. It would be contradictory to say that a contract is void for an absolute want of power to make it, and yet it may become legal and valid as a contract by way of estoppel through some other act of the party under such incapacity, or some act of the other party chargeable by law with notice of the want of power." (See also *Best Brewing Co.* v. *Klassen,* 185 Ill. 37).

Where a contract is thus void, a court of equity will not enforce a specific performance of it.

A notable illustration of this principle may be found in the case of *Sellers* v. *Greer, supra,* where the contract under consideration by the court was a contract by stockholders to sell or dispose of the corporate property without authority or ratification by the corporation, and such contract was held to have no binding effect; and the court there refused to sanction a decree granting a specific performance of it.

In *Hurlbut* v. *Kantzler,* 112 Ill. 482, a bill was filed for specific performance against Kantzler, Crilly & Blair, and also the board of education, to compel the assignment of a lease. There, Kantzler held a lease from the board of education, which was not assignable without the written consent of the board. Kantzler, however, gave to Hurlbut a written agreement to assign the lease, but it was held the agreement could not be enforced against the board as it had not assented to the agreement. In disposing of the case it is there said (p. 488): "There is no allegation in the bill, or proof, that the consent of the board of education will be given, or ever was given. * * * Hurlbut, at the time he took the contract from Kantzler, knew that the latter could not transfer his leasehold interest without the express consent of a third party, against whom he could claim no rights, legal or equitable, and consequently took his contract under such circumstances as to make its validity and effectiveness

depend upon the exercise of the will of another under no obligation to do any act for him or for his benefit."

So, in the case at bar, appellees knew at the time the present contract was executed, that the Calumet Electric Street Railway Company could not pave the street without the consent of the city, even if it could do it with such consent. The appellees took their contract from the Calumet company, knowing that its validity depended upon the exercise of the will of the city, a third party. The city of Chicago is not a party to the present bill, and a contract to pave a public street could not be enforced without making the city of Chicago a party, if it could be enforced at all. Inasmuch, therefore, as the appellees accepted the contract with full knowledge that it could not be enforced without the consent of a third party, and that its validity depended upon the exercise of the will of a third party, they cannot enforce the specific performance of such contract by the present bill. The street had not been paved when the present bill was filed on July 21, 1897, although by the terms of the contract it was to be paved not later than December 1, 1896. The city did not make it a condition to the grant to the Calumet company of the right to lay down its tracks in the street, that the company should pave the street, nor did the city in any way take any steps towards the paving of the street, or authorize any other person or corporation to do so. The fair inference, therefore, is that the city did not regard the paving of the street as a necessity, or as an act to be done for the benefit of the public. Knowing all this when they filed the present bill, appellees were not entitled to a specific performance of the contract.

This being so, there can be no decree in the present case for damages, that is to say, for the amount of the check for $1000.00 and interest thereon. Where, in a bill for specific performance, a court of equity grants a decree for damages, the decree for damages is merely an-

cillary to the relief of specific performance, and is the result of granting that relief. But, where the bill makes no case for a specific performance and shows no ground for such relief, a court of equity will not decree damages, because a court of equity does not sit for the purpose of entertaining bills, whose only object is to secure damages. The remedy in such case is at law, and not in equity.

It has been held in a number of cases, that a bill for specific performance will not be retained to assess damages for a failure to perform a contract, where the complainant, when he filed the bill, knew that the vendor had parted with the title to the property, or where the agreement is to convey property which has no existence, or to which the defendant has no title, and if the want of title was known to the complainant at the time of beginning suit. In all such cases, the bill will not be retained for the assessment of damages. (*Doan, King & Co.* v. *Mauzey*, 33 Ill. 227; *Stickney* v. *Goudy*, 132 id. 213; *Kennedy* v. *Hazelton*, 128 U. S. 667; *Hurlbut* v. *Kantzler*, *supra*; *Sellers* v. *Greer*, *supra*; *Mack* v. *McIntosh*, 181 Ill. 633). The principle of these cases is applicable here. The appellants, who made an agreement to pave a public street of the city of Chicago, had no right to control the street, and no power, without the consent of the city, to make any improvement of the street; and, this fact being well known to the appellees at the time of the beginning of this suit, the present bill, under the authorities referred to, will not be retained for the assessment of damages.

For the reasons above stated, the judgment of the Appellate Court and the decree of the circuit court are reversed, and the cause is remanded to the circuit court with directions to dismiss the bill.

*Reversed and remanded.*